UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

YOUSSOUF BAKAYOKO, GREGORY BETHER,
MICHELLE EVERETT, OSMOND GRAHAM,
JESSICA NOEL, KRYSTAL PINO, EDUARDO
QUINTERO, SERIGNE SENE, MARY WILLIAMS,
VIRGINIA WOOLARD and CATHERINE
FRANCIS,

                              Plaintiffs,

            -against-

180 BKLYN LIVINGSTON, LLC d/b/a DALLAS
BBQ, 23rd & 8th, LLC d/b/a DALLAS BBQ, 49th
BROADWAY, LLC d/b/a DALLAS BBQ, and
JOHN DOES #1-7, Jointly and Severally,

                              Defendants.

-----------------------------------------------------------------X

Docket No.:  14-CV-02430
(RJD) (MDG)

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY
## A FAIR LABOR STANDARDS ACT COLLECTIVE ACTION

*On the Brief :*
*Peter L. Contini*
*Marie Ann Hoenings*
*Daniel M. Maunz*

L'Abbate, Balkan, Colavita
 & Contini, LLP
*Attorneys for Defendants*
1001 Franklin Avenue – Third Floor
Garden City, New York 11530
(516) 294-8844
File No. 941-97720

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................iii

FACTS........................................................................................................... 1

ARGUMENT

      POINT I
      Tip Allocation For Servers Of At Least Eight
      Percent of Gross Sales is Required by Law ........................................... 3

      POINT II
      There is No FLSA Minimum Wage Violation ...................................... 6

      POINT III
      There is No Common Policy, Practice or Scheme that Violates the FLSA............. 7

        A.  If Side Work Is Done Off The Clock, It Is
           Not As A Matter Of Dallas BBQ Policy ..................................... 8

           Cash-Out/Tip-Out Process......................................................... 13

        B.  If Servers Do Not Clock-In Until Their First Order Is
           Placed, It Is Not As A Matter of Dallas BBQ Policy................................ 15

        C.  If Servers Do Not Clock-In for Mandatory Friday
           Meetings, It Is Not As A Matter of Dallas BBQ Policy .......................... 16

        D.  Time Spent Waiting To Be Discharged And
           To Get Paid Is Postliminary and/or De Minimis .................................... 17

           Runners...................................................................................... 21

      POINT IV
      There is No Evidence of FLSA Violations
      In Other Dallas BBQ Restaurants ...................................................... 22

      POINT V
      There Is Insufficient Evidence Of Violations
      Of The FLSA On The Reimbursement Claims ..................................... 23

      POINT VI
      The Proposed Notice to Potential
      Opt-In Plaintiffs is Inappropriate........................................................ 25

A. There is No Evidence of Willfulness To Warrant
A Three Year Statute of Limitations ..................................................26

B. Posting of Notice..............................................................................28

Conclusion
The Motion By The Plaintiffs Should Be In All Respects Denied.............................29

# TABLE OF AUTHORITIES

Federal Cases

Amador v. Morgan Stanley & Co. LLC,
    No. 11 Civ. 4326, 2013 WL 494020 (S.D.N.Y. Feb. 7, 2013)...............................28

Anderson v. Mt. Clemens Potter Co., 328 U.S. 680, 692-93 (1946) ...............................20

Armstrong v. Weichert Realtors, No. 05-3120, 2006 WL 1455781
    (D.N.J. May 19, 2006) ...............................23

Ayres vs. 127 Rest. Corp., 12 F.Supp.2d 305 (S.D.N.Y. 1998) ...............................24

Barfield vs. New York City Health & Hosps. Corp.,
    No. 05 Civ. 6319, 2005 WL 3098730 (S.D.N.Y. Nov. 18, 2005).......................7, 23

Berrios vs. Nicholas v. Nicholas Zito Racing Stable, Inc.,
    849 F.Supp.2d 372, 391 (E.D.N.Y. 2012) ...............................26

Brock v. Bono, No. 85–2619–AM, 1986 WL 15451 (D. Mass 1986) ...............................24

Callari vs. Blackman Plumbing Supply, Inc., 988 F.Supp.2d 261 (E.D.N.Y. 2014)...............27

Carino vs. Broadway & 166, LLC, (S.D.N.Y., 10-cv-5506)...............................28

Carter vs. Panama Canal Co.,314 F.Supp 386(D.D.C. 1970) ...............................21

Chan vs. Triple 8 Palace, Inc., No. 03 Civ 6048, 2006 WL 851749
    (S.D.N.Y. Mar. 30, 2006)...............................24

Chhab vs. Darden Rests., Inc., No. 11 Civ 8345, 2013 WL 5308004
    (S.D.N.Y. Sept. 20, 2013) ...............................25, 26, 28

E.I. duPonte De Nemonis & Co. vs. Harrup, 227 F.2d 133 (4th Cir. 1955)...............................21

Enriquez v. Cherry Hill Mkt. Corp., No. 10–CV–5616, 2012 WL 440691
    (E.D.N.Y. Feb. 10, 2012) ...............................25

Fior D'Italia, Inc. vs. United States, 21 F.Supp.2d 10977 (N.D. Cal., 1998);
    aff'd 242 F3d 844 (9th Cir. 2001); rev'd 536 U.S. 238 (2002) ...............................5

Gjurovich vs. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d 101 (S.D.N.Y. 2003)...............25

Guan Ming Lin v. Benihana Nat'l Corp., 755 F.Supp. 2d 504 (S.D.N.Y. 2010)...............23, 24

Gunawan v. Sake Sushi Rest., 897 F.Supp.2d 76 (E.D.N.Y. 2012)...........................................27

Gustafson v. Bell Atl. Corp., 171 F.Supp.2d 311 (S.D.N.Y. 2001) ......................................27

Guzelgurgenli v. Prime Time Specials Inc., 883 F.Supp.2d 340 (E.D.N.Y. 2012)..................25

Hall v. Guardsmark, LLC, 2012 WL 3580086 (WD Penn., Aug. 17, 2012)............................18

Hodgson vs. Katz & Besthoff, #38, Inc., 365 F.Supp (193, 1197 n.3 (W.D.L. 1973)  ............21

Hoffmann-LaRoche, Inc. vs. Sperling, 493 U.S. 165 (1989) ................................................25

IBP, Inc. v. Alvarez, 546 U.S.21 (2005)...................................................................................20

Ikikhueme v. Culinart, Inc., No. 13 Civ 293, 2013 WL 2395020 (S.D.N.Y. June 3, 2013) ....... 7

Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706 (2d Cir. 2001)..................20

Kuebel v. Black & Decker Inc., 643 F.3d 352 (2d Cir. 2011)....................................................26

Levinson v. Primedia Inc., No. 02 Civ 2222, 2003 WL 22533428
   (S.D.N.Y. Nov. 6, 2003)........................................................................................................7

Litras vs. PVM Int'l Corp., No. 11–CV–5695, 2013 WL 4118482
   (E.D.N.Y. Aug. 15, 2013).....................................................................................................27

Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106 (2d Cir., 2013).....................6

Mack v. United States, 814 F.2d 120 (2d Cir. 1987)..................................................................18

Mayhue's Super Liquor Stores, Inc. v. Hodgson, 464 F.2d 1196 (5th Cir. 1972) .....................24

Morrison Rests. Inc. vs. United States, 918 F.Supp. 1506 (S.D. Al 1996), .................................5

MQuatters vs. Conner,, T.C. Memo 1973 ...................................................................................5

Myers v. Hertz Corp., 624 F.3d 537 (2d Cir. 2010) ............................................................7, 23

Nicholas Zito Racing Stable, Inc., 849 F.Supp.2d 372 (E.D.N.Y. 2012)..................................27

Perez vs. G & P Auto Wash, Inc., 930 F. Supp. 2d 423 (E.D.N.Y. 2013) ................................20

Pullen v. McDonald's Corp., No. 14-11081, 2014 WL 4610296
   (E.D. Mich. Sept. 15, 2014), the court...................................................................................8

iv

Romero v. H.B. Automotive Group, Inc., No. 11 Civ. 386, 2012 WL 1514810
    (S.D.N.Y. May 1, 2012) .................................................................................. 7, 8

Sanchez v. JMP Ventures, L.L.C., No. 13 Civ. 7264, 2014 WL 465542
    (S.D.N.Y. Jan. 27, 2014) ............................................................................... 7, 12

Sharma vs. Burberry, Ltd., 2014 W.L.4385426 (E.D.N.Y. Sept. 4, 2014).................................23

Solis v. SCA Rest. Corp., 938 F.Supp.2d 380 (E.D.N.Y. 2013) .............................................. 26

Summa v. Hofstra Univ., 715 F.Supp.2d 378 (E.D.N.Y. 2010)................................................ 25

U.S. vs. Klinghoffer Bros. Realty Corp., 285 F.2d 487 (2d Cir. 1960) ........................................ 6

William vs. Twenty Ones, Inc., No. 07 Civ 3978, 2008 WL 2690734
    (S.D.N.Y. June 30, 2008) ................................................................................... 7

Young v. Cooper Cameron Corp., 586 F.3d 201 (2d Cir. 2009)................................................ 27


Federal Statutes

26 U.S.C.§6053(5) ........................................................................................................ 5
29 U.S.C §§203(m), 206(a)(1)........................................................................................ 6
29 U.S.C. §254(a) ...................................................................................................... 19
29 U.S.C. §255(a) ...................................................................................................... 26
Section 6053(c) to the Internal Revenue Code ............................................................... 5


Federal Regulations

29 CFR §778.217.......................................................................................................... 24
29 CFR 785.24............................................................................................................ 19
29 CFR 785.47............................................................................................................ 20
29 CFR 790.7(g)......................................................................................................... 20
29 CFR 790.8(c) ......................................................................................................... 20

State Regulations

12 NYCRR §146-1.3 ..................................................................................................... 6

Other Authorities

Supreme Court Tips Balance in Favor of the Service by Authorizing Aggregate Assessment of
    Unreported Employee Tips:  United States v. Fior D'Italia, Inc.,
    55 Tax Law 971 (Summer 2002)........................................................................... 4

## FACTS

At our request, we were permitted to engage in discovery prior to this motion having been filed because the complaint's allegations were entirely conclusory and devoid of evidentiary facts. We produced documents to the extent we were able as the cash-out reports are stored in a warehouse and not electronically recorded. We deposed three of the plaintiffs who were submitted for deposition as being representative of the claims asserted in this lawsuit. Although our discovery was brief and preliminary, it was sufficient to show that the plaintiffs' allegations are not only insupportable but demonstrably false. There is no basis to believe any allegation asserted by any plaintiff.

The essential facts as to how servers work at the Dallas BBQ restaurant are set forth in the declaration of Mohammed Hossain (known as "Moazzem") and will not be repeated here. We respectfully refer this court to the Hossain declaration as a knowledge of those facts is essential to understanding the issues in this lawsuit and the arguments in this brief. The facts discrediting plaintiffs' allegations which are established through documentary evidence are that they are not required to clock-out at the same time as they print the cash-out reports and then do their side work off the clock. The time record exhibits which are discussed in this brief prove that the plaintiffs at times have clocked out more than 30 minutes after printing their cash-out reports, affording them ample time to count and distribute their cash, and do side work. Other time record exhibits attached to our opposition papers prove that on many occasions the plaintiffs clock-in before the restaurant is even open, thus disproving their allegation that they are forced to wait for the first customer to place an order before they clock-in. We also have attached time record exhibits demonstrating that the plaintiffs frequently are clocked in during the Friday 4:30 meetings, again

establishing the falsity of their claims that they were required to be off the clock when attending those meetings.

Plaintiffs are unable to identify a single manager who told them to do their side work off the clock or that the cash distribution was to be done off the clock. They admit to doing such work on the clock on occasion and that they were never disciplined, punished or criticized for doing such work on the clock. They do not know any server who was disciplined, punished or criticized for doing such work on the clock. In addition to the plaintiffs' time records and their testimony, we have attached declarations from servers at other Dallas BBQ restaurants who were identified as having told plaintiffs that they work off the clock at other Dallas BBA locations. They deny that they are compelled to work off the clock at other locations and that they made any such statements to the plaintiffs.

While it cannot be disputed that servers have clocked out at the same time as they printed their cash-out reports, those same servers will on occasion clock-out 10, 20, 30 minutes or more after they print their cash-out reports. Their testimony, the declarations of the defendants, and the time records all make it abundantly clear that Dallas BBQ does not have a policy, procedure or scheme to compel the plaintiffs to do compensable work off the clock. The plaintiffs have not supplied any evidentiary fact to support  a claim that there was a policy, procedure or scheme to compel plaintiffs to do compensable work off the clock. Their allegations should not be accepted not only because they are contradicted by the documentary evidence but also because plaintiffs have testified falsely as set forth herein.

2

## POINT I

### TIP ALLOCATION FOR SERVERS OF AT LEAST
### EIGHT PERCENT OF GROSS SALES IS REQUIRED BY LAW

Plaintiffs claim that they are assessed 8% of cash and credit card sales as the amount of tips they receive during a shift and that this violates the FLSA. For income tax reporting purposes, all servers are deemed to receive tips at no less than eight percent of credit card and cash sales after distributing tips of 5.25% to other tipped-out employees. Thus, for both income tax and tip distribution purposes, the tipped parties are deemed to receive a total of 13.25% in tips. Servers receive tips from the customers and then tip-out a total of 5.25% to bussers, expediters, and bartenders.

Plaintiffs complain that their cash tips are less than 8% and, therefore, they end up paying out of pocket monies to the tipped out parties (bussers, expediters, and bartenders) without having any money for themselves at the end of their shift. We have attached as Exhibit I cash-out reports for plaintiff Bakayoko for the months of February 2013, February 2014, and April 2014.[1] The documents at Exhibit I contain POS reports showing clock-in and clock-out times over a three month period with the cash-out report for one month within that time period immediately following. Thus, after the first two pages which are POS clock-in and clock-out reports covering January through March, the pages which follow are cash-out reports covering the month of February within that same time period. At the very bottom of the cash-out reports, the percentage of credit card sales left as credit card tips to the server is displayed. The first cash-out report dated February 6, 2013, at Exhibit I, shows a credit card tip percentage of 19.66%. The second cash-out

---

[1] Because of the bulk of these cash-out reports, we randomly selected these months but they are representative of tips received by these plaintiffs.

3

report of February 8, 2013 shows a credit card tip percentage of 16.77%. The third cash-out report of February 8, 2013 shows a credit card tip percentage of 14.10%. The fourth cash-out report of February 10, 2013 shows a credit card tip percentage of 15%. The next cash-out report of February 10, 2013 shows a credit card tip percentage of 15.39%. A review of credit card tips for all servers will show that the tip percentages for credit card tips generally range at or above 15% in each of these months. Attached as Exhibits J and K are the same types of reports for plaintiffs Graham and Quintero. These likewise show credit card tips in the same range. Please note that the small Brinks drop receipts next to the cash-out reports are separate documents printed by the Brinks safe, not the POS terminals, and that the time on the Brinks safe is not synchronized with the time on the POS terminals.

Whether customers pay by cash or credit card, if there are parties of five or more at any time of the day, they are assessed an automatic suggested service charge of 15% and parties of all sizes are likewise assessed an automatic suggested service charge of 15% for all orders placed after 8:00 p.m. (Hossain and Levine declarations). In fact, more than half of the tips for a closing shift (dinner and thereafter) are subject to those automatic suggested service charges (Levine declaration). Plaintiff Quintero testified that if he worked the closing shift, 90% of his tables had the automatic suggested 15% service charge. (Quintero deposition transcript, Exhibit E, p. 62, lns. 15-24). The service charges apply regardless of whether the charges are paid by cash or credit card (Hossain declaration, Levine declaration). More than 95% of the customers accept and pay the automatic suggested service charge (Hossain declaration).

Servers have a long history of not declaring their true tip income. Published estimates indicated that a paltry 16% of tip income was reported in 1981. See the article at Exhibit P, *Supreme Court Tips Balance in Favor of the Service by Authorizing Aggregate Assessment of*

4

*Unreported Employee Tips: United States v. Fior D'Italia, Inc. 55 Tax Law 971* (Summer 2002). A 1986 report for the Internal Revenue service confirmed that the trend continued through the early 1980s. The report noted "the only type of income with a lower compliance rate was illegal income, at four percent." Id. citing Kathleen Pender, *Servers to Get Tips in Tipping, S.F. Chronicle*, June 20, 2002. "According to 1998 IRS estimates, fewer than 40% of all tips received were reported, an estimated $9-12 billion in unreported income." *Unreported Tip Income: A Taxing Issue*. The CPA Journal, Dec. 2006. In response, Congress passed the Tax Equity & Fiscal Responsibility Act of 1982 adding section 6053(c) to the Internal Revenue Code which requires employers whose employees failed to report at least 8% of gross sales as tips to allocate tips equal to 8% of revenue among employees. 26 U.S.C. 6053(c). This 8% is often misconstrued as the actual amount of tips that must be reported. Rather, it is the minimum amount in recognition that tips received are actually much higher.[2]

Of greatest significance for our case is the fact that the Internal Revenue Code provides that "the employer shall not be liable to any person if any amount is improperly allocated under paragraph (3)(B) if such allocation is done in accordance with the regulations prescribed under paragraph (3)(B)." 26 U.S.C.§6053(5). Thus, an employer is provided absolute immunity if it allocates tips in accordance with the regulation. It seems incongruous that defendants' use of an allocation of the IRS percentage for tips as required by the Internal Revenue Code could sustain a claim of a violation of the FLSA. This would effectively condone underreporting, as well as circumvent the immunity provided by §6053(5).

---

[2] In FICA audits, the following determinations of cash tips as a percentage of gross sales by the IRS have been sustained. 12.15 and 12.32% Morrison Rests. Inc. vs. United States, 918 F.Supp. 1506 (S.D. Al 1996), vacated and remanded by 118 F.3d. 1526 (11th Cir., 1997); 12% MQuatters vs. Conner, T.C. Memo 1973, 240 and 14.49 and 14.29% Fior D'Italia, Inc. vs. United States, 21 F.Supp.2d 10977 (N.D. Cal., 1998); aff'd 242 F3d 844 (9th Cir. 2001); rev'd 536 U.S. 238 (2002).

## POINT II

## THERE IS NO FLSA MINIMUM WAGE VIOLATION

Under the FLSA, the minimum wage for tipped food service employees (including the tip credit) is $2.13 per hour. 29 U.S.C §§203(m), 206(a)(1).

Dallas BBQ complies with the New York State Labor Law regulation 12 NYCRR §146-1.3, which requires it to pay its employees $5.00 per hour (including the tip credit). Since this rate is more than two times the rate required under the FLSA, any employee who is paid for less than 40 hours per week is adequately compensated for any alleged off the clock work. Any claim that any employee was not adequately compensated for time worked within a 40 hour work week is a claim for "gap time" which is not recognized in the FLSA. Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106, 116 (2d Cir., 2013) ("[t]he agreement to work certain additional hours for nothing was in essence an agreement to accept a reduction in pay. So long as the reduced rate exceeds the minimum wage an agreement to accept reduced pay is valid") (alterations omitted); see also U.S. vs. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 494 (2d Cir. 1960).

With regard to plaintiffs who claim they worked more than 40 hours per week and were forced to work off the clock and uncompensated for those extra hours, they too do not have an FLSA claim. Assuming payment for only 40 hours at a rate of $5.00 per hour, the server receives $200 in wages, as opposed to $85.20 required by the FLSA. That leaves a surplus payment of $114.80. Using the FLSA minimum overtime wage of $5.76 (one and one-half times the $7.25 minimum wage minus the tip credit of $5.12), the server would have to be performing 20 off the clock hours per week in order for his/her wage to fall below the FLSA minimum wage. That would mean the servers would have to be performing off the clock work of four hours per day. A review

6

of the pleadings and declarations reveals that none of the plaintiffs allege anything near that many hours of off the clock work.

**POINT III**

**THERE IS NO COMMON POLICY, PRACTICE
OR SCHEME THAT VIOLATES THE FLSA**

In order to obtain an order of conditional certification under §216(b) of the Fair Labor Standards Act (FLSA), plaintiffs must prove through actual admissible evidence that there was a common policy, practice, or scheme to violate the FLSA and demonstrate that potential class members are similarly situated. <u>William vs. Twenty Ones, Inc.</u>, No. 07 Civ 3978, 2008 WL 2690734, at *1 (S.D.N.Y. June 30, 2008); <u>Barfield vs. New York City Health & Hosps. Corp.</u>, No. 05 Civ. 6319, 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005); <u>Levinson v. Primedia Inc.</u>, No. 02 Civ. 2222, 2003 WL 22533428, at *1 (S.D.N.Y. Nov. 6, 2003). Although the factual showing necessary is "modest", the plaintiffs' proof "must be sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." <u>Levinson</u>, 2003 WL 22533428 at *1 (quotations omitted). Moreover, "while plaintiff's burden of proof is low, it is not non-existent – certification is not automatic." <u>Ikikhueme v. Culinart, Inc.</u>, No. 13 Civ. 293, 2013 WL 2395020, at *2 (S.D.N.Y. June 3, 2013) (quotations and alterations omitted); <u>see also</u> <u>Sanchez v. JMP Ventures, L.L.C.</u>, No. 13 Civ. 7264, 2014 WL 465542, at *1 (S.D.N.Y. Jan. 27, 2014); <u>Romero v. H.B. Automotive Group, Inc.</u>, No. 11 Civ. 386, 2012 WL 1514810, at *10 (S.D.N.Y. May 1, 2012).

A plaintiff cannot meet its burden "simply by unsupported assertions . . . or with conclusory allegations." <u>Sanchez</u>, 2014 WL 465542, at *1 (quotations omitted); <u>see also</u> <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 555 (2d Cir. 2010) ("[t]he 'modest factual showing' cannot be satisfied simply by

7

'unsupported assertions'"); Romero, 2012 WL 1514810, at *10 (explaining that plaintiffs' "modest factual showing cannot be satisfied simply by unsupported assertions . . . .") (quotations omitted).

Further, at least one court recognized that when a motion for conditional certification is made after discovery has been taken, it does not make sense to certify a class when the record is clear that it will later have to be decertified. In Pullen v. McDonald's Corp., No. 14-11081, 2014 WL 4610296 (E.D. Mich. Sept. 15, 2014), the court denied the plaintiffs' motions for conditional certification, explaining that "at the post-discovery stage, it is almost certain that the court ultimately would find that the plaintiffs are not similarly situated in order to certify a class under the FLSA." Id. at *2. While we have only engaged in brief and preliminary discovery, the evidence produced to date overwhelmingly refutes all of the plaintiffs' claims.

## A.      **If Side Work Is Done Off The Clock, It Is Not As A Matter of Dallas BBQ Policy**

The plaintiffs claim that side work such as filling condiments and stacking plates is something which must be done off the clock. Side work should generally be done before the cash-out report is printed (Hossain declaration). The servers do the side work at the tables as they are vacated by the customers at the end of the server's shift so that when the last table leaves it should not take more than five minutes to do the side work for that last table. Furthermore, depositing money in the Brinks safe should only take a few minutes and dividing up the tip-out money for the employees should only take several minutes. As plaintiff Bakayoko admitted, dividing the money for the tipped out parties can take less than 5 minutes (Exhibit C, p. 83 ln. 15 – p. 84, ln. 5). Similarly, plaintiff Graham admitted it can take as little as 5 minutes to divide up the tip out money and the house money (Exhibit D, p. 56, lns. 11-21).

The plaintiffs claim that they were compelled to clock out at the same time they ran the cash-out reports and then to do the side work, divide the cash to be distributed to the tip out parties and the restaurant, and deposit the cash into the Brinks safe. While all of this work can be done in about 5 minutes, we checked to see how often these plaintiffs took 5 minutes or less between the time they printed the cash-out report and the clock-out report and how many times they took more than 5 minutes between printing the cash-out report and then clocking out. If they took more than 5 minutes, it is clear that they accomplished all of their tasks before clocking out other than checking out with the manager in order to be discharged.

Attached at Exhibit L is a chart prepared with respect to the eleven plaintiffs. The lines with the blue and white reflect times where the plaintiffs clocked out more than 5 minutes after printing the cash-out reports.[3] The lines in yellow reflect where the time between the clock-out and printing the cash-out report is 5 minutes or less. The lines in red reflect where they clocked out before printing the cash-out report. The grey area is where we are missing POS reports with respect to clock-in and/or clock-out times.[4] As can be seen from plaintiff Bakayoko's time entries on the first page, more often than not on that first page, his clock out time was more than 5 minutes after he printed his cash-out reports. Later in 2013 he began to print his cash-out reports and his clock-out reports at the same time but not always. For instance, on March 29, 2014, he printed his cash-out report at 12:19 a.m. but he did not clock out until 1:00 a.m. which is 40 minutes later. On April 12, 2014, he printed his cash-out report at 12:49 a.m. but he did not clock out until 1:10 a.m., 21 minutes later. On the first page of plaintiff Bakayoko's chart, looking at the first week of February,

---

[3] It is our understanding that the court's electronic filing system will not accept color documents. Chambers will receive a full set of these motion papers including the color exhibits and we will deliver to plaintiffs' counsel the color exhibits.
[4] We have been in touch with POSitron about the missing data and we hired a computer expert but, to date, we have not been able to retrieve all data for the year 2013. Nevertheless, we have a substantial majority of the data for 2013.

9

it can be seen that on February 1 he printed the cash-out report 7 minutes before he clocked out, on February 2 he printed the cash-out report 32 minutes before he clocked out, on February 6 he printed the cash-out report 7 minutes before he clocked out, and on February 7 he printed the cash-out report 7 minutes before he clocked out.

In addition to the eleven plaintiffs, we randomly selected eleven other servers by taking every fourth name on our list of servers to see what their clock-out and cash-out habits were.[5] Many of the non-party servers followed similar patterns to the plaintiffs in that sometimes they clocked out more than 5 minutes after printing the cash-out report and other times within 5 minutes or less. Their documented course of conduct establishes that there is no policy or practice in this regard but, rather, it is a matter of choice.

Plaintiff Bakayoko testified that he clocks out and then does his side work because that is how he was taught but he cannot say who told him (Exhibit C, p. 34, lns. 6-25). Later in his deposition he testified the he could not recall if it was a manager or the person who trained him (not a manager) who told him to clock out and then do side work (Exhibit C, p. 67, lns. 2-21). Other than when he was first trained, no manager repeated the point that he had to clock out before doing side work. (Exhibit C, p. 88, ln 25 – p. 89, ln. 23). Indeed, servers are trained by "trailing" other servers, not by managers (Hossain declaration). Plaintiff Bakayoko conceded that there is nothing in writing that says the side work must be done after clocking out (Exhibit C, p. 36, lns. 13-17) and he was never disciplined, reprimanded or punished for doing side work before clocking out (Exhibit C, p. 66, lns. 22-25). He does not know of any other server who was reprimanded or

---

[5] Due to limitations in time and resources, and the fact that the cash-out reports are not electronically stored, we were not able to retrieve records for all employees in time for this motion but we are continuing to endeavor to retrieve all records from the warehouse and copy them. Whatever we obtained and copied has been produced to plaintiffs' attorney.

disciplined for clocking out as the last step before going to the manager to be discharged.  (Exhibit C, p. 89, ln 24 – p. 90, n. 4).

Plaintiff Osmond Graham testified that he was trained by servers at Times Square (Exhibit D, p. 6, ln. 23 – p. 7, ln. 3).  He clocks out before he does his side work but no manager told him specifically that that is what he was supposed to do.  (Exhibit D, p. 39, ln 20 - p. 40, ln. 2).  Once or twice he clocked out after doing the side work (Exhibit D, p. 40, lns. 3-6).  He was not reprimanded or disciplined or criticized for clocking out after he did the side work (Exhibit D, p. 40, lns. 7-9).  He never saw another server be reprimanded, disciplined, or criticized for clocking out after doing side work. (Exhibit D, p. 40, lns. 10-14).  He is not aware of anything in writing that says he has to clock out before he does the side work (Exhibit D, p. 40, lns. 14-18).

Plaintiff Quintero testified that he could not remember if any manager told him he had to do the side work after he clocked out (Exhibit E, p. 58, lns. 3-7).  On several occasions he did side work before he clocked out (Exhibit E, p. 58, lns. 8-15).  He was not disciplined for clocking out after doing side work and he is not aware of any server who was disciplined for clocking out after doing side work (Exhibit E, p. 58, ln. 16 – p. 59, ln. 4).

Not a single one of the eleven plaintiffs identify a manager who required the work to be done off the clock, nor did any provide any evidentiary fact of such a policy or procedure (Exhibit B, Responses to Interrogatory 2(f)).  In essence, the plaintiffs claim "the company made me do it" without any factual support.  The employment handbook (Exhibit O) at section III.4 "Time Records" states to all employees: "You are to record the time when you begin to work at the beginning of the day and when you finish work at the end of the work day, not simply when you first arrive at or leave the premises."

In <u>Sanchez v. VMP Ventures LLC,</u> 2014 WL 465542 at*1 (SDNY Jan. 27, 2014) the court held that the factual record supporting the plaintiffs' motion was "insufficient to support even an inference that a common policy or plan that violated the law existed with respect to th[e] variety of potential opt-in plaintiffs [proposed in the motion]." 2014 WL 465542 at *1. Although the lead plaintiff claimed that the defendants' alleged policies "were the 'common practice' at all [restaurants] since each restaurant's inception based on 'observations' and 'conversations' with other employees (whose first names he lists)", the court stressed that "[p]laintiff does not . . . provide *any* detail as to a *single* such observation or conversation." <u>Id.</u> at *2. The court concluded that it accordingly could "not know where or when these observations or conversations occurred, which is critical in order for the Court to determine the appropriate scope of the proposed class and notice process." <u>Id.</u>

The simple fact is that servers make between $20 and $30 per hour with wages and tips. Even assuming it takes a full half hour to do side work and they do it off the clock, that means the servers would be forfeiting about $2.50 in wages, a small amount compared to their hourly compensation. When they clock out at the same time they print the cash-out report, it is obvious it is because it is more convenient to not have to go back to the terminal a second time in order to clock out. It helps to expedite their discharge process but it is clearly not a policy of Dallas BBQ and the plaintiffs are unable to give any evidentiary fact of instruction or policy that they are required to do so. As noted above, their documented conduct belies their words in that there are plenty of times when they clocked out even more than a half hour after printing the cash-out reports.

Cash-Out Tip-Out Procedure

The plaintiffs also claim that in addition to doing side work off the clock, they are required to do the cash distribution off the clock.   That is, they clock-out at the same time they print the cash-out report and all of their activities involving side work, tip distribution, and depositing cash in the Brinks safe is allegedly off the clock because Dallas BBQ requires it that way.  Plaintiffs complaint (Exhibit A), and all of the plaintiffs interrogatory answers (Exhibit B), do not provide any evidentiary facts identifying managers who expressly told the plaintiffs that they had to perform their cash-out tip-out procedure off the clock.  Plaintiff Bakayoko, when asked to explain why his clock-out time was more than 5 minutes after he printed his cash-out reports, stated that he may have paid the tip-out parties and deposited money in the Brinks safe between printing the cash-out report and clocking out.  (Exhibit C, p. 63, ln 9 – p. 65, ln 4).  In fact, he admitted that with an 18 minute spread between cash-out and clock-out the time differential may be attributed to paying the tipped out parties, depositing the money in the Brinks safe, and he may have done his side work before clocking out (Exhibit C, p. 65, ln 5 – p. 66, ln 6).

Plaintiff Graham testified that he clocks out first and then walks to the back to deposit the money in the Brinks safe because he tries to avoid an extra walk to the back to find a designated server to sign the clock-out sheet.  (Exhibit D, p. 52, ln. 21 – p. 53, ln. 17).  Thus, it is merely for his own convenience.  Plaintiff Quintero testified that after he deposited the money into the Brinks safe he would then clock-out.  (Exhibit E, p. 55, lns. 20-24).  There is no reason for the server to clock-out at the same time that the server prints the cash-out report because the clock-out report is not needed until it has to be presented to the designated server on a closing shift or the manager to be checked out in order to be discharged.

13

The plaintiffs claim that there are long lines at the safe to deposit the Brinks money which causes delay but, in fact, the departures of the servers are staggered during the course of the evening. All of the servers are not clocked out at the same time and, in fact, they clock out only a few at a time. Plaintiff Bakayoko acknowledged that if he works a shift from dinner to closing there will be many tables available for him to count out money for tipped employees at the end of the shift (Exhibit C, p. 53, ln. 20 – p. 54, ln. 12) and that at closing time on a Saturday night the restaurant is not normally busy (Exhibit C, p. 65, lns 10-20). Quite obviously, the restaurant is less crowded the closer it gets to closing time and the departure of the servers is staggered as the customers depart (Hossain declaration). Plaintiff Graham also testified that servers would be told to go home early when not needed so that there would not be 19 servers hanging around at the end of the evening (Exhibit D, p. 70, ln. 17 – p. 71, ln. 10). He also acknowledged that he could make cash deposits to the safe during his regularly scheduled time (Exhibit D, p. 79, ln. 19 – p. 80., ln. 7). Plaintiff Quintero testified that after he deposited the money into the Brinks safe he would then clock-out (Exhibit E, p. 55, lns. 20-24). He also testified that only one closing station stayed open until the very end and that other servers would do clock-out and cash-out earlier in the evening (Exhibit E, p. 57, lns. 8-17).[6]

As reflected in the testimony of plaintiff Osmond Graham and as is clear from the time records of the employees, the decision to clock out before or after dividing the tip money and depositing the money in the Brinks safe is a matter of discretion exercised by the servers which they do voluntarily and not as a result of a policy or practice of Dallas BBQ. Dallas BBQ neither

---

[6] If we are provided more time we will retrieve all of the cash-out and clock-out reports for all the servers at the restaurant to establish that their departure times are staggered and, therefore, the long lines alleged by plaintiffs simply do not exist.

14

requests nor condones any employee performing any work off the clock other than preliminary or postliminary activities.

**B.    If Servers Do Not Clock In Until Their First Order
Is Placed, It Is Not As A Matter Of Dallas BBQ Policy**

For seven days a week the restaurant opens at 11:30 a.m. and not earlier.  We are operating under a fair assumption that when the restaurant opens its doors it will take at least 5 minutes for patrons to be seated, place their order with a server, and then have the server clock-in and place the order at a POS terminal.  Therefore we have prepared a chart (Exhibit M) which reflects all those times that the plaintiffs servers clocked in no later than 11:34 a.m. on any day when they worked a day shift.  As it is not possible to demonstrate conclusively that they clocked in upon beginning work if they worked a later shift, we are limited in our ability to conclusively establish they clocked in before entering an order in the POS terminal to those days when they had a day shift and they clocked in no later than 11:34 a.m.  As reflected on the annexed chart, on numerous occasions all of the plaintiffs clocked in no later than 11:34 a.m. on many of their day shifts.  By far the large majority of those clock-in times were before 11:30 a.m. which means before the restaurant even opened.  Thus, they did not wait to clock in until an order was received from a customer.  This is just another example of where the documented conduct of the plaintiffs puts the lie to their sworn allegations.  As reflected in the annexed declarations of Mohammed Hossain, Eric Levine, and Joseph Shpigel, there is no policy at the Dallas BBQ restaurants for the employees to not clock-in until the first order is placed.

The reason why on occasion the plaintiff servers will not clock-in until the first order is placed is explained by the testimony of plaintiff Osmond Graham, (Exhibit D, at p. 73, ln 15 – p. 74, ln. 9).  He testified that he does not clock-in unless he has a table to wait on because, if it is

15

slow, the manager will ask him if he wants to go home but he will lose the opportunity to go home if he is clocked in.  He readily admitted that he saw servers who clocked in before they started working on tables and, further, that no one told him that he should not clock-in before he started waiting on tables. (Exhibit D, p. 19, lns. 18-24).  He conceded there were times when he would clock-in before he started waiting on tables (Exhibit D, p. 20, lns. 7-24).  He never saw a server disciplined in either Brooklyn or Times Square for clocking in before beginning to wait on a table (Exhibit D, p. 23, lns. 11-18).

Plaintiff Bakayoko testified at first that a manager trained him in 2008 and told him to not swipe his card until he actually had a customer at a table, but when pressed for detail, he conceded: "I can't pinpoint anybody that specifically said that."  (Exhibit C,  p. 19, lns 12-25).  He conceded that not all servers waited to swipe their card to clock-in until the first table was seated.  (Exhibit C, p. 20, lns. 11-18).  Plaintiff Quintero testified that no one told him to wait for the first customer to clock-in instead of when his shift started. (Exhibit E, p. 46, lns. 13-17).

Based on the testimony of the parties and their actual clock-in times, it is clear that if they elected to wait to clock-in, it was their own voluntary action and it was not a policy of Dallas BBQ.  There simply is no policy that servers are to wait until the first order is placed before they clock-in and plaintiffs have not established such a policy sufficiently to permit conditional certification.

## C.      If Servers Do Not Clock In For Mandatory Friday Meetings, it Is Not As A Matter Of Dallas BBQ Policy

The plaintiffs allege that at 4:30 on Fridays they have to attend a mandatory meeting at the restaurant and they are not allowed to clock in.  Once again, their time records establish the falsity of their sworn testimony.  Attached at Exhibit N is a chart depicting the times that the plaintiffs were clocked in between 4:30 and 5:00 on Fridays for the year 2013.  The yellow shows those

times they were clocked in for the meetings.   While not all plaintiffs were clocked in on all Fridays between 4:30 and 5:00, all plaintiffs on many occasions were clocked in within that time frame.  There was no policy that the meetings had to be attended off the clock and no server was ever punished, disciplined, or reprimanded for being on the clock during those meetings (Hossain and Levine declaration).  Whether a server forgot to clock in or decided to hold off clocking in to see if the server might want to leave early are matters left for speculation but what is irrefutable is that there was no policy in place to have them off the clock for these meetings and that very often the servers, including plaintiffs, attend the meeting while having been clocked in.

**D.      Time Spent Waiting To Be Discharged and
        To Get Paid Is Postliminary and/or De Minimis**

The plaintiffs now claim in their declarations that they had to do their cash and tip reconciliation by sitting down with managers to do so. There are no such allegations in the interrogatory answers. (See, Exhibit B).  Interrogatory 2(f) requested the plaintiffs to set forth the nature of the work performed off the clock and none of the plaintiffs responded that they had to "sit down" with managers to reconcile cash distributions.  Plaintiff Graham testified that it takes between 5 and 10 minutes to count out the money for the tipped out parties and for the restaurant (Exhibit D, p. 56, lns 11-21).  Plaintiff Graham testified that to have the manager review the paperwork can take less than 2 minutes (Exhibit D, p. 61, ln. 12 – p. 62. Ln. 17).  He testified that the managers check the credit card slips but not that he sits down with a manager to reconcile cash. Plaintiff Quintero testified that he didn't recall what the procedure was at Dallas BBQ because at his present restaurant he has to do his own mathematical calculations as to the money to be tipped out and in his mind he is unable to distinguish what he does in his present job and what he did at

Dallas BBQ. However, he did not testify that the managers count the money with him or for him (Exhibit E, p. 53, lns. 4-20).

Only plaintiff Bakayoko testified that managers also count the tip-out cash but he did not testify that he has to sit down with managers to count cash distributions or that he has to be present when the manager supposedly double checks the amount of cash distributed to the tipped-out parties. (Exhibit C, p. 55, lns. 9 – 20). It is significant that he also testified that dividing the money for the tipped out parties can take less than 5 minutes (Exhibit C, p. 83, ln. 15 – p. 84, ln. 5). Most importantly, he does not go to the manager until everything is completed including his side work (Exhibit C, p. 59, lns. 2-12). He testified that at the end of the day to get clearance from the manager the clearance can be done within 2 to 3 minutes because the manager has to go through every credit card (Exhibit C , p. 88, lns. 10-24). He did not testify about the manager having to reconcile cash. In fact, he testified that as soon as he prints the cash-out report, he divides the money for the tipped out parties and staples the money to the report (Exhibit C, p. 34, lns. 6-22). Thus, by his own testimony, the money is stapled when presented to the manager which is the last thing he does before discharge. He clearly does not have to stay there if the manager does in fact unstaple the money, count it, and then restaple it.

The allegation that the servers have to sit down with the managers to reconcile cash is pure fiction and not asserted in any discovery response or through deposition testimony. These allegations which were not set forth by the parties in discovery proceedings should be disregarded. Cf., Hall v. Guardsmark, LLC, 2012 WL 3580086 (WD Penn., Aug. 17, 2012) (declarations contradicting prior testimony are to be disregarded on a motion for conditional certification.); Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987)("It is well settled in this circuit that a party's

18

affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment").

Plaintiff Bakayoko testified that at the end of the day to get clearance from the manager the clearance can take less than 2 minutes for the manager to go through every credit card (Exhibit C, p. 88, lns. 10-24). Plaintiff Graham testified that to have the manager review his paperwork can take less than 2 minutes (Exhibit D, p. 61 ln12 – p 62 ln 17). Plaintiff Quintero is at a new job and can't recall the check-out process at Dallas BBQ (Exhibit E, p. 53 lns 4-20). Mohammed Hossain states that the check-out process with managers should take less than one minute. The cash-out reports at Exhibits I, J, and K reflect that the amount of credit charges during a shift is generally less than 20.[7] It takes only one second to look at each credit card slip to see that it is signed so that process can be accomplished in 20 seconds or less. It takes only another few seconds to confirm that the amount on the Brinks safe receipt is the same as indicated due to the restaurant on the cash-out report. There is no reason for the entire process to take more than one minute.

The Portal to Portal Act of the FLSA, 29 U.S.C. §254(a) states: "[N]o employer shall be subject to any liability for or on account of . . . (2) activities which are preliminary to and postliminary to principal activity or activities which occur either prior to the time on any particular work day at which such employee commences, or subsequent to the time on any particular work day at which he ceases such principal activity or activities." The term "principal activities" is defined at 29 CFR 785.24 as all activities which are an integral part a principal activity. "Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance." "However, activities such as checking in and out and

---

[7] The Cashout Reports Totals near the top of the cash-out report shows the number of credit card charges for MC/Visa and Amex.

19

waiting in line to do so would not ordinarily be regarded as integral parts of the principal activity or activities." This was further amplified at 29 CFR 790.7(g) which states: "Other types of activities which may be performed outside the work day and . . . would be considered 'preliminary' or 'postliminary' activities, including checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive paychecks." See also 29 CFR 790.8(c): "However, activities such as checking in and out and waiting in line to do so would ordinarily not be regarded as integral parts of the principal activity or activities." See generally IBP, Inc. v. Alvarez, 546 U.S.21 (2005) (discussing the Portal-to-Portal Act).

In addition, the amount of time expended by servers going through the check-out process and runners voluntarily waiting to get cash tips is de minimis. The de minimis principle is explained at 29 CFR 785.47: "In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled work hours, which cannot as a practical administrative matter be recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis" (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S.680, 692-93 (1946)). This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes' duration, and where the failure to count such time is due to considerations justified by industrial realities. Anderson, 328 U.S. at 692. Courts look at the following factors to determine de minimis: (1) practical administrative difficulty or recording the additional time; (2) the size of the claim in the aggregate; and (3) whether the claimants performed the work on a regular basis. See Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 719 (2d Cir. 2001); Perez vs. G & P Auto Wash, Inc., 930 F. Supp. 2d 423, 431-32 (E.D.N.Y. 2013).

Most courts after <u>Anderson</u> have found daily periods of up to 10 minutes to be de minimis and not compensable. <u>E.I. duPonte De Nemonis & Co. vs. Harrup</u>, 227 F.2d 133, 136 (4th Cir. 1955) (counting cash before start of shift de minimis); <u>Carter vs. Panama Canal Co.</u>, 314 F.Supp 386, 392 (D.D.C. 1970) (2 to 15 minutes negligible and not compensable) aff'd 463 F.2d 1289 (D.C. Cir.), crt. denied, 409 U.S. 10/2 (1972); <u>Hodgson vs. Katz & Besthoff, #38, Inc.</u>, 365 F.Supp (193, 1197 n.3 (W.D.L. 1973) (10 minutes spent before shift to count cash and ensure everything is in order was de minimis.

Runners

Only one plaintiff was a runner, that being plaintiff Quintero. He was a runner for a portion of his time as an employee at Dallas BBQ. He was never a runner while at the Brooklyn location. As a runner he clocked in at the start of his scheduled shift (Exhibit E, p. 33, lns. 10-19). As a runner at the end of the day he would clean up the kitchen and then he would clock out and wait to get paid (Exhibit E, p. 38, lns. 10-24). In order to be paid his cash tips at the end of the day, he could either have the money kept in the office for him to pick up the next day or he could wait until the cash was available from the servers and take it home with him that night (Exhibit E, p. 39, ln 20 – p. 40, ln. 9). Thus, the only activity that runners did after clocking out was waiting to get paid their cash tip money. Furthermore, they did not have to wait to get their cash tips as they could just as easily have picked up the cash the next day, so this was their own choice. Quintero provided no evidence that runners were required to do any work off the clock. Waiting to get paid is postliminary and not an FLSA violation.

21

## POINT IV

## THERE IS NO EVIDENCE OF FLSA VIOLATIONS
## IN OTHER DALLAS BBQ RESTAURANTS

As reflected in the declaration of Eric Levine, certain policies such as who does side work and when are left to the discretion of the managers at each local Dallas BBQ restaurant. There is no policy in place for all of the Dallas BBQ restaurants. The policies which are in place for all of the Dallas BBQ restaurants concern the tip-out policies which, as set forth above, are not FLSA violations. Therefore, in the event this court determines a class may be conditionally certified, it should be limited to the Brooklyn location.

The declaration of Joseph Shpigel with attached exhibits reflects that the restaurants which are the named defendants in this action all have separate individual ownership. There is no parent corporation or organization. This court may take judicial notice of the Department of State records which show that there is no Wetanson Corporation (see, Exhibit Q).

The Plaintiffs rely on hearsay statements from servers who work in other Dallas BBQ restaurants in an effort to seek to encompass other locations in this litigation. There were 11 persons contacted by Plaintiffs with experience at other Dallas BBQ locations and a number of those persons no longer work at Dallas BBQ. We made efforts to contact those persons we could locate and we were able to obtain declarations from three of them. Those declarations are attached at Exhibit F. All three deny that they were forced to work off the clock at those other locations. Importantly, all three deny having made such a statement to any Plaintiff. We spoke to two other persons from the group identified by the plaintiffs and while they confirmed that they were not required to work off the clock at the other locations and that they did not make such statements to any plaintiff, they declined to provide us with declarations. In any event, it is clear that plaintiffs

22

have supplied false testimony to this court as to what persons have said to them as to working conditions at other Dallas BBQ locations.

The plaintiffs' limited hearsay declarations should not be sufficient to certify a class as to other restaurant locations (see Barfield, 2005 WL 3098730 at *1), nor should statements about co-workers not founded on personal knowledge. Armstrong v. Weichert Realtors, No. 05-3120, 2006 WL 1455781, at *2 (D.N.J. May 19, 2006). The Second Circuit has indicated that the threshold "cannot be satisfied by unsupported assertions." Myers vs. Hertz Corp., 624 F.3d 537 at 555 (2d Cir. 2010) (citations omitted). Similarly, broad allegations without factual support or "sufficient specificity" will not satisfy even the modest requirements of the collective action standard. Guan Ming Lin v. Benihana Nat'l Corp., 755 F.Supp. 2d 504, 511 (S.D.N.Y. 2010).

In Sharma vs. Burberry, Ltd., 2014 W.L.4385426 at *12-13 (E.D.N.Y. Sept. 4, 2014), the court refused to permit conditional certifications for all New York stores based upon conclusory assertions that violations occurred "in every store" absent factual details regarding the particular store. Similarly, the plaintiffs herein seek to include the other locations through false declarations that the purported violations are occurring in other locations. This is insufficient to meet their burden and the court should not certify the case as to other locations to the extent it is inclined to certify at all.

## POINT V

### THERE IS INSUFFICIENT EVIDENCE OF VIOLATIONS OF THE FLSA ON THE REIMBURSEMENT CLAIMS

Plaintiffs allege only in generalities that defendants do not reimburse them for uniforms, aprons, and the claim that they paid for walkouts. However, there is not any evidence of the value of these claims nor is there any claim that, even if this were the case, their effective rate of pay

would fall below the minimum wage. FLSA allows employers to shift uniform purchases and reimbursements for shortages to employees so long as doing so does not reduce the employee's wages below the minimum wage. 29 CFR §778.217; Guan Ming Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 511 (S.D.N.Y. 2010); Chan vs. Triple 8 Palace, Inc., No. 03 Civ. 6048, 2006 WL 851749, at *22 n.39 (S.D.N.Y. Mar. 30, 2006); Ayres vs. 127 Rest. Corp., 12 F.Supp.2d 305, 310 (S.D.N.Y. 1998); see also Mayhue's Super Liquor Stores, Inc. v. Hodgson, 464 F.2d 1196, 1199 (5th Cir. 1972) (agreement to reimburse employer for shortages violates FLSA to the extent the payment reduces the employees' wage below minimum wage); Brock v. Bono, No. 85–2619–AM, 1986 WL 15451, at *1 (D. Mass 1986) ("an employer cannot require employees to pay 'shortages' if repayment results in paying wages below the minimum rate").

The declarations, as they pertain to payment for walkouts, do not set forth the dates or amounts paid for the walkouts, any proof of payment, nor do they even attempt to allege that when this occurred it caused them to receive less than the minimum wage. In fact, the plaintiffs concede that there is no requirement for reimbursement, just a progressive disciplinary practice. Plaintiffs have failed to detail what their "uniforms" comprise of - likely because they are ordinary wardrobe items such as black shirts and pants. We submit that the failure to provide such evidence prevents this court from certifying claims in a collective action. Guan Ming Lin v. Benihana Nat'l. Corp., 755 F.Supp.2d 504, 512 (S.D.N.Y. 2010) ("Plaintiffs have again failed to present their allegations with sufficient specificity to satisfy even the modest requirements of the collective action standard. With respect to their uniform reimbursement claim, the plaintiffs have failed to detail what their 'uniforms' are comprised of and, in particular, whether they consist of ordinary wardrobe items— such as black shirts and pants—or specially-made clothing items").

24

**POINT VI**

**THE PROPOSED NOTICE TO POTENTIAL
OPT-IN PLAINTIFFS IS INAPPROPRIATE**

The District Court has broad discretion over the form and content of the Notice. Summa v. Hofstra Univ., 715 F.Supp.2d 378, 392 (E.D.N.Y. 2010) ("[u]nder the FLSA, the content of the notice to be provided to potential class members is left to the broad discretion of the district court"); see also Gjurovich vs. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d 101, 106 (S.D.N.Y. 2003) (citing Hoffmann-LaRoche, Inc. vs. Sperling, 493 U.S. 165, 170 (1989)).  However, while giving notice to as many plaintiffs as possible, the court should not permit a fishing expedition. Chhab vs. Darden Rests., Inc., No. 11 Civ. 8345, 2013 WL 5308004, at *15 (S.D.N.Y. Sept. 20, 2013) (citing Guzelgurgenli v. Prime Time Specials Inc., 883 F.Supp.2d 340, 356 (E.D.N.Y. 2012)); Enriquez v. Cherry Hill Mkt. Corp., No. 10–CV–5616, 2012 WL 440691 (E.D.N.Y. Feb. 10, 2012). Here, the proposed notice is too broad in that it includes alleged state law claims, includes too many locations, and includes categories of employees for which there simply is no evidence of an FLSA violation.

The proposed composition of the collective action class includes both servers and runners without qualification.  As indicated herein, there is no evidence that policies pertaining to runners violate the FLSA.  As to servers, there is no qualification as to those servers who worked overtime or to those servers who performed services off the clock such as doing side work.  Furthermore, the introduction references the New York Labor Law and claims which are brought only pursuant to the New York Labor Law as well as claims for unauthorized video surveillance which is neither under the New York Labor Law nor the FLSA.  In addition, the introduction refers to "wage

deductions" without explanation and "an unlawful tip pool"[8] without explanation. In essence, a person reading this notice would think that if there were deductions from that person's pay or the person engaged in a tip pool, then that person is entitled to money by participating in this lawsuit. We respectfully submit this notice is entirely deficient and defective as there is no capacity for any employee reading this notice to know whether that employee should or should not opt in to this lawsuit. As can be seen from the time records attached to these opposition papers, there are fair number of servers who never worked overtime, and as can be seen from these exhibits, there are a significant number of servers who did not do work off the clock.

Most importantly there is no evidence that any of the allegations pertaining to the Brooklyn location also pertain to any other location for a Dallas BBQ restaurant. Importantly, evidence must be presented by plaintiffs to sustain their burden as to each of the location in order for those locations to be included. See, Burberry at *12-15, (court denied certification nationally and for additional New York locations where there was no evidence other than conclusions that the unlawful policies were being implemented at "every" store).

## A. There Is No Evidence Of Willfulness To Warrant A Three Year Statute Of Limitations

Under the FLSA, the time period for liability is extended from two years to three if defendant is found to have acted willfully. See 29 U.S.C. §255(a); see also Solis v. SCA Rest. Corp., 938 F.Supp.2d 380, 393 (E.D.N.Y. 2013) (citing 29 U.S.C. §255(a)). An employee willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited. Kuebel v. Black & Decker Inc. 643 F.3d 352, 366 (2d Cir. 2011); Berrios

---

[8] A tip pool or tip sharing only violate the FLSA if tips are shared with non-tipped employees which is not alleged in this case. See, 29 USC§203(n).T; Chhab vs. Darden, 2013 W.L. 5308004 at *5.

26

vs. Nicholas v. Nicholas Zito Racing Stable, Inc., 849 F.Supp.2d 372, 391 (E.D.N.Y. 2012) (quoting Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009)). "The burden is on the employee to show willfulness." Young, 586 F.3d at 207; see also Gunawan v. Sake Sushi Rest., 897 F.Supp.2d 76, 87 (E.D.N.Y. 2012) ("[t]he employee bears the burden of proving willfulness, which requires a factual showing that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA") (quotations and alterations omitted).

Generally, willfulness is left to the trier of fact. Litras vs. PVM Int'l Corp., No. 11–CV–5695, 2013 WL 4118482, at *5 (E.D.N.Y. Aug. 15, 2013). Courts are willing to decide same, however, where the record contains no evidence that would suggest willfulness. Callari vs. Blackman Plumbing Supply, Inc., 988 F.Supp.2d 261, 280 (E.D.N.Y. 2014); Gustafson v. Bell Atl. Corp., 171 F.Supp.2d 311, 323-24 (S.D.N.Y. 2001). For example, in Gustafson, the court determined that plaintiff did not satisfy his burden to establish willful or reckless violation of the FLSA because all that was presented was speculation and mere conclusions. Gustafson, 171 F.Supp.2d at 323-324.

Here, all that is presented to the court to establish willfulness are alleged errant complaints to supervisors that on particular limited undocumented occasions the server did not receive sufficient cash tips to cover the tip sharing. Indeed, there is no evidence of the amounts expended, the dates this occurred, the value of the credit card tips received, the number of occasions this happened, nor the identity of the manager complained to. Moreover, there is no evidence that this situation caused plaintiffs to receive less than the minimum wage so as to establish an FLSA violation.

In an attempt to bootstrap the lack of evidence of willfulness, plaintiffs cite to another and separate case that defendants were involved in. <u>Carino vs. Broadway & 166, LLC,</u> (S.D.N.Y., 10-cv-5506). The complaint (docket number 1) alleged FLSA overtime violations but, class counsel, after reviewing of all the evidence, abandoned the alleged FLSA violations which were dismissed by the judgment entered in that case (docket number 35. See paragraph 17 of the judgment).

To support a claim of willfulness, plaintiffs also allege their hours are "shaved." We submit herewith a declaration of Buzz Cmaylo from CC Productions, Inc. as well as the declaration of Mohammed Hossain which indicates that the managers of Dallas BBQ have the ability to adjust clock-in or clock-out time but any such adjustment will be clearly denominated as such in the system and in any print-out by the system.   Therefore, the conclusory allegation of the plaintiffs (which they have not been able to document or substantiate) that their hours of work have been tampered with is conclusively proven to be a total fiction as there are no adjustments shown for their time. The clock-in and clock-out reports are entirely reliable and accurate.

**B.      Posting of Notice**

Posting herein would be unnecessary given the contact information plaintiffs request. <u>Chhab vs. Darden Rests., Inc.,</u> No. 11 Civ. 8345, 2013 WL 5308004, at *17 (S.D.N.Y. Sept. 20, 2013) (agreeing that "posting is unnecessary where defendants provide sufficient contact information for potential collective members"); <u>Amador v. Morgan Stanley & Co. LLC,</u> No. 11 Civ. 4326, 2013 WL 494020, at *10 (S.D.N.Y. Feb. 7, 2013) (concluding that posting notice at plaintiffs work locations is unnecessary when the form of notice is mailed to potential plaintiffs).

## CONCLUSION

### THE MOTION BY THE PLAINTIFFS
### SHOULD BE IN ALL RESPECTS DENIED.


Dated: October 29, 2014
       Garden City, New York

Respectfully submitted,

L'Abbate, Balkan, Colavita
 & Contini, LLP


By: _____
         Peter L. Contini
Attorneys for Defendants
1001 Franklin Avenue – 3rd Floor
Garden City, New York 11530
(516) 294-8844
File No. 941-97720

Of Counsel:
Peter L. Contini
Marie Ann Hoenings
Daniel M. Maunz